ACWOO INTERNATIONAL STEEL
CORPORATION, Plaintiff–Appellee,

v.

TOKO KAIUN KAISH, LTD. (86–1735),

and

Nicholson Terminal & Dock Company,
(86–1734), Defendants–Appellants.

Nos. 86–1734, 86–1735.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1987.

Decided March 7, 1988.

Marlin F. Scholl, Scholl & Stieg, Detroit, Mich., Robert J. Giuffra, argued, Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, John D. Mabley, argued, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Donna R. Milhouse, for defendants-appellants.

Martin B. Mulroy, argued, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, Philip G. Meyer, West Bloomfield, Mich., for plaintiff-appellee.

Before JONES and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is an appeal from a judgment entered by the District Court for the Eastern District of Michigan after a five-day bench trial finding defendants Toko Kaiun Kaish ("Toko") and Nicholson Terminal & Dock Company ("Nicholson") jointly and severally liable for rust damage to a steel shipment from Korea, the damage accruing to plaintiff Acwoo International Steel Corporation's ("Acwoo") cargo. The defendants primarily contend that the district court was in error in awarding the judgment against them because it made no finding as to whether the shipment was actually damaged while in the possession of Toko or Nicholson or both. Toko also contends that, in lieu of such a finding, the district court erroneously invoked a presumption of liability as to it. Defendants further con-

tend that, in any event, the district court erred with respect to rulings on damages.[1] Because we agree with the defendants on these issues, we remand the case to the district court for proceedings consistent with this opinion.

### I.

This case deals with a claim for fresh water damage to a shipment of 307 cold rolled steel coils shipped from Pohang, Korea, to Detroit, Michigan, aboard Toko's chartered vessel, the M/V Hosei Maru, and stored in Nicholson's warehouse there. Acwoo was the importer of the cargo.

The steel coils were packed at a Korean steel mill in May of 1979. In packing the coils, the mill coated them with a water soluble oil, wrapped them in water-resistant paper, and then encased them in "wasters" which are metal envelopes completely covering the coils. These wasters were secured by steel bands.

In July of 1979, the steel coils were delivered to the M/V Hosei Maru while that vessel was at the port of Pohang. Toko issued thirty bills of lading under which the coils were carried. The bills of lading incorporated the terms of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300, *et seq.* These bills of lading stated that the goods were shipped in "apparent good order and condition." The bills also contained rust clauses, however, which provided:

> The term "apparent good order and condition" when used in this bill of lading with reference to iron, steel or metal products does not mean that the goods, when received, were free of visible rust or moisture. If the shipper so requests, a substitute bill of lading will be issued omitting the above definition and setting forth any notations as to rust or moisture which may appear on the Mate's or Tally Clerk's receipts.

There is no contention by Acwoo that a request for substitute bills was ever made.

Shortly thereafter, the vessel sailed from Pohang, and arrived in Detroit in early September. In Detroit, four surveyors viewed the cargo in the holds of the vessel immediately upon arrival. They were Russell Frank, representing Acwoo's cargo underwriters; Christopher Coury, representing Toko Line; Robert Harris, representing Nicholson Terminal; and Hugh Fowley, representing Acwoo.

Coury and Harris testified that the waster-wrapped steel coils appeared to be in "normal condition" for coils shipped from Asia. Fowley, on the other hand, observed rust and fresh-water wetting conditions on approximately fifty of the wasters. Fowley, however, did not mark the rust-damaged wasters for future reference. Neither did he "decan" the coils (remove them from the wasters) to determine if the coils, themselves, were rust damaged.

Because the steel was not needed immediately, Acwoo requested that Nicholson store the steel coils in one of its warehouses. Nicholson recommended that they be placed in one of its heated warehouses to prevent rusting. Acwoo, however, disregarded this recommendation, preferring, instead, to have the coils stored in a "transit" shed. Transit sheds have open doors and bays which would permit the entry of rain and snow during inclement weather.[2]

In late March of 1980, Fowley returned to the warehouse to inspect the shipment. He noted more advanced rusting on many of the wasters. Additionally, he observed that several of the waster-wrapped coils were sitting in pools of water. It is uncontroverted that, during January of 1980, leaks developed in the roof of the warehouse in which the shipment was stored and in the warehouse's drainpipes. As a result, the waster-wrapped coils were frequently doused with water. Shortly there-

---

1. Both defendants raise, in their briefs to this court, other issues as well. We decline to address these issues, however, finding that they were not raised in the district court.

2. At trial, Fowley testified that he "understood" that the coils would be put under tarpaulins with small heating units next to the coils. Neither of these steps was taken. The district court, however, in its opinion and order, does not discuss this aspect of Fowley's testimony.

after, Acwoo sold eighty-four of the coils at a profit.

In late May of 1980, Fowley again returned to the warehouse to inspect the shipment. For the first time, Fowley actually had some of the coils removed from their wasters and examined. In total, twenty-one of the 223 remaining coils were decanned. Of these twenty-one coils, twelve were placed on a "slitting" machine which uncoiled the steel so that the steel's face could be examined for rust. All twelve of these coils exhibited rusting.

In November of 1980, Acwoo began soliciting bids for the 223 remaining coils of steel. In December, Acwoo sold the steel for salvage.

In the meantime, Acwoo had filed suit against Toko and Nicholson seeking damages for the loss in value of its steel. Nicholson counterclaimed for its unpaid storage charges. A bench trial was conducted before the district court in December of 1985. At trial, Fowley testified that the initial water damage to Acwoo's steel coils *could* have occurred in Jacksonville, Florida, where the ship unloaded cargo during a heavy rain from the same holds as those containing the steel coils. Additionally, Fowley testified that he observed a condensation problem in one of the holds in which steel was contained during his initial inspection of the coils.

In a memorandum and order dated April 29, 1986, the district court found against both Toko and Nicholson, and entered a judgment in favor of Acwoo for $62,101.32 plus costs, interest, and attorney's fees against both defendants jointly and severally, and the court denied Nicholson's counterclaim for storage charges. On June 25, 1986, the district court entered an order amending the judgment, increasing the recovery for damage to the steel coils to $145,168.10 pursuant to Acwoo's motion. It is from this judgment that defendants now appeal.

## II. *Acwoo v. Toko*

### A.

In holding Toko liable for damage to Acwoo's steel coils, the district court concluded that Acwoo met its burden of proving a *prima facie* case of damage to the steel caused by carrier negligence. This *prima facie* case is, in reality, a species of *res ipsa loquitur*, and is comprised of two elements: (1) delivery of the goods to the carrier in good order and condition; and (2) discharge from the vessel in damaged condition. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981). Toko's principal contention on appeal is that Acwoo did not meet its burden of proving delivery to it in good condition.

The district court determined that Acwoo met its burden of proving that the steel coils were in good condition when they were delivered to the ship in Pohang by offering into evidence "clean" bills of lading for the coils. The court failed, however, to notice that the bills of lading had "rust clauses" in them specifically disavowing any representation that the coils were free from rust. This failure is understandable—in its proposed findings of fact and conclusions of law, Toko did not offer a defense based on the rust clauses.

After the district court reached its decision as to liability, however, Toko timely filed a motion to amend and supplement findings of fact and conclusions of law pursuant to Rule 52(b) of the Federal Rules of Civil Procedure. In this motion, it pointed out to the district court the existence of the rust clauses in the bills of lading and moved the court to find that the clauses prevented Acwoo from establishing by the bills of lading that the coils were delivered to the ship in a rust-free condition. The district court denied this motion without disclosing any reasons.

A review of the case law reveals that the district court's decision to deny Toko's motion was error. The district court was correct in noting that a clean bill of lading generally meets the requirement that the cargo-owner prove that the carrier received the goods in good condition. *Caemint Food*, 647 F.2d at 352. A bill of lading with a rust clause, however, is not "clean" and cannot be used to establish delivery of the steel to a carrier free of

rust. *Tokio Marine & Fire Ins. Co. v. Retla Steamship Co.*, 426 F.2d 1372, 1377–1378 (9th Cir.1970); *Gradmann & Holler v. Continental Lines*, 504 F.Supp. 785, 788 (D.P.R.1980); *Dorsid Trading Co. v. S.S. Rose*, 343 F.Supp. 617, 623 (S.D.Tx 1972).

 Acwoo asserts, however, that, even if it failed to make out a case of carrier negligence by use of the *res ipsa loquitur*-type presumption by failing to show delivery of the coils to Toko in a rust-free condition, it should still prevail against Toko because it made out a traditional case of negligence by Toko in handling the coils. Specifically, Acwoo refers to the alleged negligence of Toko in unloading other cargo from the same holds as the ones in which the steel coils were stored during a rainstorm in Jacksonville, Florida, and also allowing condensation to accumulate on some of the coils. However, the existence of a negligent act on the part of a defendant does not, *ipso facto*, make a case of liability for negligence. A plaintiff must also prove that the defendant's negligent act was a proximate cause of his injury. The *prima facie* case of carrier negligence delineated in *Caemint Food* eases the plaintiff's burden of proving causation by presuming it if the plaintiff can demonstrate that the damaged cargo was delivered to the shipper in an undamaged condition. In the instant case, without the aid of this presumption, Acwoo bore the burden of establishing an actual causal link between Toko's alleged negligence and the ultimate rusting of the coils. However, the district court, improperly relying on the *Caemint Food* presumption, did not re-solve the issue of whether the rusting occurred while in Toko's possession. We note also that, in the absence of evidence that the steel was not rusted when delivered to Toko, it would be difficult, if not impossible, to prove by the preponderance of the evidence that the rusting occurred while in Toko's possession.[3]

### B.

It is obvious from our discussion that this case must be remanded to the district court for a determination of whether Acwoo can make out a case of liability against Toko by creating a presumption of negligence and proximate cause or by showing that Toko committed a negligent act and that such act was a proximate cause of the rusting. In the event that, on remand, the district court determines that Acwoo has made a case of liability against Toko, it will be necessary for it to reconsider Toko's limitation of liability defense which was apparently rejected, *sub silentio*, by the district court. This defense is based on a provision in the bills of lading to the effect that liability is limited to $500 per coil.[4]

 Section five of COGSA facially appears to limit the liability of a carrier to $500 per package unless the cargo-owner declares a greater value and the greater value is inserted into the bill of lading. 46 U.S.C. § 1304(5). However, in *Cincinnati Milacron, Ltd. v. M/V American Legend*, 784 F.2d 1161 (4th Cir.), *rev'd en banc on other grounds*, 804 F.2d 837 (1986), the Fourth Circuit recently held:

While the language of sec. 1304(5) could be interpreted to make the operation of

---

3. Acwoo raises additional arguments for Toko's liability despite the presence of the rust clauses in the bills of lading. First, Acwoo asserts that the district court was correct in finding that the bills of lading were clean despite the rust clauses because a carrier which attempts to limit its liability on a bill of lading must show that it informed the shipper of the provision and afforded the shipper an opportunity to secure an alternative bill of lading—something that Toko allegedly failed to do. *See Pan American World Airways v. California Stevedore and Ballast Co.*, 559 F.2d 1173, 1176 (9th Cir.1977). And second, Acwoo avers that Toko's act of delivering the steel coils to Detroit rather than Chicago (as the bills of lading specified) constitutes an unreasonable deviation from the terms of Toko's con-tract with Acwoo and negates any contractual defenses found in the bills of lading—i.e., the rust clauses. *See Vistar, S.A. v. M/V Sea Land Express*, 792 F.2d 469, 472 (5th Cir.1986). Because neither of these arguments was made to the district court, we refrain from considering them on appeal.

4. Toko raised this defense in its proposed findings of fact and conclusions of law but the district court failed to discuss this issue in its memorandum and order. Since Toko's liability for damages exceeded $500 per coil, we construe the district court's silence on the issue as a rejection of Toko's argument.

the limitation rest solely on the conduct of the shipper, it has not. Before the limitation is effective, "the carrier must give the shipper 'a *fair opportunity* to choose between higher or lower liability by paying a correspondingly greater or lesser charge.'"

*Id.* at 1163 (citations omitted). The court went on to explain that the carrier has the initial burden of proving fair opportunity and that a bill of lading which contains language from which a fair opportunity can be gleaned is *prima facie* evidence of such opportunity. The burden then shifts to the shipper to show that no fair opportunity was given. *Id.*

▪ The bills of lading issued to Acwoo were introduced by Toko at trial and contain, in paragraph seventeen, a valuation limitation which incorporates the language of 46 U.S.C. § 1304(5) and similar language in the Hague Rules.[5] Consequently, Toko clearly met its *prima facie* burden of proving that it provided Acwoo with "a fair opportunity to choose between higher or lower liability by paying a greater or lesser charge." The burden then shifted to Acwoo to show lack of a fair opportunity to acquire higher coverage for a higher price. Upon remand, the district court should determine whether Acwoo is able to meet this burden if the liability of Toko is established.

▪ Acwoo posits two arguments for the inapplicability of paragraph seventeen of the bills of lading to its case. First,

Acwoo asserts that the language of paragraph seventeen is ambiguous and should not be enforced. Such is not the case. The language specifically refers to 46 U.S.C. § 1304(5) and closely tracks the language of that section. There is therefore no ambiguity in paragraph seventeen.

Second, Acwoo argues that not only must Toko show that paragraph seventeen gives Acwoo the option of purchasing greater liability coverage, Toko also bears the burden of demonstrating that Acwoo knew of this provision and was afforded an opportunity to purchase the greater coverage. In support of this proposition, Acwoo cites *Pan American World Airways v. California Stevedore and Ballast Co.*, 559 F.2d 1173 (9th Cir.1977). *Pan American,* however, involved a case where the limitation-of-liability clause did not give the cargo-owner the opportunity to purchase greater coverage. Because of the absence of this provision, the court determined that Pan American, the carrier, bore the burden of proving such an opportunity. *Id.* at 1175, 1177. In the instant case, since the liability clause specifically states that the cargo-owner may request greater coverage, *Pan American* is inapplicable, and, upon remand, Acwoo must bear the burden of proving that it did not have an opportunity to secure greater coverage.

### III. *Acwoo v. Nicholson*

#### A.

▪ It should be noted initially that COGSA does not apply to Acwoo's claim

5. Paragraph seventeen provides, in relevant part:

Notwithstanding any other provision of this bill of lading, neither the carrier nor the ship shall in any event be or become liable for any loss, nondelivery, or misdelivery of or damage or delay to, or in connection with the custody or transportation of the goods in an amount per package or unit greater than the amount per package or unit provided in Article 4, Section 4, of the Hague Rules or the corresponding provisions of whichever enactment of the Hague Rules is applicable under Paragraph 1(b) hereof unless the nature of the goods and a valuation higher than said amount is declared in writing by the shipper on delivery to the carrier and inserted in the bill of lading and extra freight is paid thereon if required in which case, even if the true

value of the goods per package or unit exceeds such declared value, the value shall nevertheless be deemed to be the declared value and any carrier liability shall not exceed such declared value *and any partial loss or damage shall be adjusted pro rata on the basis thereof....* No other declaration or agreement shall be evidence of a value different from that provided. During any carriage or period to which the U.S. Carriage of Goods by Sea Act (46 USCA § 1300 et seq.) is compulsorily applicable, the provisions of § 4(5) of said Act (46 USCA § 1304(5)) shall supersede any inconsistent provisions of this Paragraph 17. The provisions of this paragraph 17 shall, however, fully apply during all carriage or periods (such as, but not limited to, the period before loading and after discharge) where said act is compulsorily applicable.

against Nicholson since Nicholson is a stevedore and warehouseman, not a carrier. *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 301–02, 79 S.Ct. 766, 769–70, 3 L.Ed.2d 820 (1959). As the district court correctly determined, the law of Michigan controls.[6]

■ Section 440.7102(1)(h) of Michigan Compiled Laws provides that, in order to establish a claim of negligence against a warehouseman, the bailor must establish that the warehouseman failed to exercise reasonable care. Michigan courts, however, have eased the bailor's burden of proving breach of this duty of care in much the same way as federal courts have eased the cargo-owner's burden of proving breach by a shipper. In Michigan, the case law provides that a bailor can make out a *prima facie* case of liability against a warehouseman by showing two things: (1) delivery of the goods in good order; and (2) return of the goods in a damaged state. *Columbus Jack Corp. v. Swedish Crucible Steel Corp.*, 393 Mich. 478, 227 N.W.2d 506 (1975).

In the instant case, the district court stated that: "[t]he Court finds it somewhat difficult to pinpoint with certainty when the coils were damaged," and actually made no finding as to whether the coils were rusted when they were in Toko's possession or Nicholson's possession or both. The district court, nevertheless, found that Acwoo made out a "prima facie claim of negligence" against Nicholson. If by "negligence" the district court means only a failure to exercise reasonable care by the warehouse, there is evidence in the record to support this finding. However, as we have heretofore stated, to hold Nicholson liable, there also must be a finding, supported by evidence, that the rust damage to the steel occurred while it was in Nicholson's possession. We therefore must remand for a determination of whether the

steel was damaged while Nicholson possessed it.[7]

### B.

■ It is undisputed that Acwoo failed to pay Nicholson $19,642.52 owing under the warehouse contract. After granting Acwoo its full amount of damages, however, the district court declined to grant Nicholson's counterclaim for the amount owing under the contract because, "Nicholson should not be allowed to benefit from its own wrongdoing." This decision was in error. Upon remand, Nicholson is entitled, as a matter of law, to recover on its counterclaim for unpaid storage charges.

If Nicholson prevails upon remand, it will be entitled to its unpaid storage charges since the court will have found either that Nicholson did not breach its obligation or that any breach on the part of Nicholson did not result in damage to Acwoo. Even if Acwoo prevails against Nicholson, Nicholson is still entitled to its storage charges. As stated in section 278 of *American Jurisprudence 2d:*

> It is a general rule that the amount of damages recoverable from a warehouseman for injury to or loss of the stored goods may be reduced by the amount of storage charges properly interposed by the warehouseman.

> It has been declared that if a warehouseman storing perishable goods for another makes good to such other all losses caused by his negligent storing, it is equivalent to a proper delivery and entitles him to his storage charges.

78 AM.JUR.2D *Warehouses* § 278 (1964).

### C.

In holding Toko and Nicholson jointly and severally liable for the rust damage to Acwoo's steel coils, the district court awarded Acwoo its attorney's fees against

---

**6.** Presumably jurisdiction as to Nicholson is based on diversity. However, although the complaint alleges that Nicholson is a Michigan corporation with principal place of business there, it does not allege Acwoo's state of incorporation and principal place of business. On remand, the district court should require proof of jurisdiction as to Nicholson.

**7.** Obviously, if the district court, upon remand, is unable to determine in whose possession the rusting took place, Acwoo's claim against Toko must also be dismissed for identical reasons.

both. Toko does not challenge, on appeal, the district court's decision to award Acwoo its attorney's fees. Nicholson, on the other hand, objects to the district court's award of attorney's fees against it, contending that it is not liable for fees even if it is otherwise liable to Acwoo.

In a diversity case such as the one between Acwoo and Nicholson, attorney's fees should be awarded only if authorized under state law. 19 C. WRIGHT, A. MILLER & H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4513 (West 1982). *See, e.g., Clark v. National Travelers Life Ins. Co.,* 518 F.2d 1167, 1168–69 (6th Cir.1975). In Michigan, recovery of attorney's fees generally is not allowed as an element of costs or as an item of damages unless expressly authorized by state statute or court rule. *Newport West Condominium Ass'n v. Veniar,* 134 Mich.App. 1, 350 N.W.2d 818 (1984); *Auto Owners Ins. Co. v. Biddis,* 123 Mich. App. 232, 333 N.W.2d 232 (1983); *Scott v. Hurd–Corrigan Moving & Storage Co.,* 103 Mich.App. 322, 302 N.W.2d 867 (1981). Acwoo has not cited to, nor has our own research uncovered, any Michigan statute or court rule that would allow an award of attorney's fees in this case absent a clause in the warehouse receipts allowing for such award or a showing of bad faith on the part of Nicholson in defending against Acwoo's suit. The district court found no such basis to award fees against Nicholson, and there appears in the record before us no evidence of either bad faith or a contractual provision mandating the award of attorney's fees. The district court was, therefore, without authority in taxing Acwoo's fees as costs against Nicholson.

Acwoo cites us to numerous cases in which attorney's fees have been levied against stevedores in an attempt to show that, in *admiralty,* such awards are within the district court's discretion. This argument is without merit. In the first place, as has. been previously noted, Acwoo's claim against Nicholson does not arise under admiralty law but under the Michigan law of bailment. And second, the cases which Acwoo cites in support of the proposition that attorney's fees are taxable against stevedores deal with the duty of stevedores (and others) as *principals* to indemnify *carriers*—who act as their *agents*—for attorney's fees incurred by the carriers in defending against lawsuits arising from the stevedores' actions. *See, e.g., Rederi A/B Dalen v. Walter C. Maher,* 303 F.2d 565 (4th Cir.1962); *McMillan Welding & Machine Works v. General Towing Co.,* 247 F.Supp. 402 (E.D.La.1965). These cases of *indemnification* simply do not apply to the instant case since Acwoo is clearly *not* the *agent* of Nicholson.

### IV.

As has been stated, the district court found that Toko and Nicholson are jointly and severally liable for all damage to the steel. In the event, on remand, the district court finds again that both defendants are liable because the negligence of both caused damage to the steel, the district court will then have to determine whether, in spite of the fact that the negligence of these defendants occurred consecutively rather than concurrently, each may be held jointly liable for all damage to the steel.

### V.

For the foregoing reasons, the judgment of the district court is REVERSED and the case REMANDED to the district court for further proceedings consistent with this opinion.