**ACWOO INTERNATIONAL STEEL CORP., Plaintiff,**

v.

**M/V HOSEI MARU, her engines, tackle, boats, etc., Yasuda Trust Bank Company, Ltd., Toko Kaiun Kaisha, Ltd., a foreign corporation, and Nicholson Terminal & Dock Company, Defendants.**

**Civ. No. 80–73356.**

United States District Court, E.D. Michigan, S.D.

June 30, 1989.

Philip G. Meyer, West Bloomfield, Mich., and Martin B. Mulroy, New York City, for plaintiff.

Robert J. Giuffra and James E. Ryan, New York City, and Martin F. Scholl, Detroit, Mich., for defendant Nicholson Terminal & Dock Co.

John D. Mabley, Detroit, Mich., for defendant Toko Kaiun Kaisha, Ltd.

MEMORANDUM OPINION
AND ORDER

Julian ABELE COOK, Jr., District Judge.

Acwoo International Steel Corporation ("Acwoo") has brought suit against Toko Kaiun Kaisha, Ltd. ("Toko"), its chartered vessel, the M/V *Hosei Maru* ("*Hosei*

*Maru* "), Yasuda Trust Bank Company, Ltd. ("Yasuda"), and Nicholson Terminal & Dock Company ("Nicholson"), alleging that the Defendants negligently damaged numerous coils of cold rolled steel imported by Acwoo.[1] The steel was shipped by Acwoo from Pohang, Korea aboard the *Hosei Maru* to Detroit. Thereafter, the cargo was stored at a facility owned by Nicholson. It is uncontroverted that the steel suffered significant rust damage and was sold for salvage at a loss to Acwoo.

Following a five-day bench trial, this Court found that Acwoo had established a *prima facie* case of negligence by Toko and Nicholson and entered a judgment which held them jointly and severally liable for the damages sustained. On appeal, the Sixth Circuit Court of Appeals reversed, noting that this Court had not entered any finding as to when the steel was actually damaged. In part, the appellate court determined that this Court had erroneously concluded that the bill of lading which had been issued by Toko on receipt of the cargo raised a presumption that the steel was free of rust on receipt, and, in so doing, it "did not resolve the issue of whether the rusting occurred while [the coils] were in Toko's possession". *Acwoo Int'l Steel Corp. v. Toko Kaiun Kaish, Ltd.*, 840 F.2d 1284, 1288 (6th Cir.1988). Similarly, no finding was made as to whether the steel had been damaged while it was in Nicholson's care. *Id.* at 1290. Having solicited and reviewed the post-remand briefs from the parties and having resolved to decide the matter based on the record, this Court enters the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.[2]

## I.

Acwoo is a Delaware corporation with its principal place of business in New York.[3]

Toko is also a foreign corporation. Nicholson is a Michigan corporation with its principal place of business in this state.

The cargo involved in this case consists of two hundred and twenty-three of the approximately three hundred cold rolled steel coils of various gauges that had been imported by Acwoo on the *Hosei Maru* and stored by Nicholson.[4] The coils were packed in May 1979, sold to Acwoo on June 12th of that year and then shipped from Pohang, Korea. The steel was initially wound into coils of varying diameters and its surface was treated with oil to inhibit rust formation. Thereafter, the coils were wrapped with a moisture resistent plastic coated paper. Finally, untreated steel "wasters" were fastened about the coil and secured by steel bands. One piece of steel was wrapped completely around the outer diameter of the coil. Another was rolled and positioned so as to cover the inner diameter or "eye" of the coil. Donut-shaped end pieces were put at each end of the coil. Perpendicular flanges were positioned to cover the entire area where each of the wasters come into contact. The wasters were then secured into place by several strips of steel. In this manner, three different levels of protection were afforded the steel: the outer metal wasters, an inner paper lining and, finally, a coating of oil on the steel itself.

On July 6, 1979, Toko issued 30 separate bills of lading which covered the 300 rolls. Each bill contained a so-called "Retla rust clause" which reads as follows:

The term 'apparent good order and condition' when used in this bill of lading with reference to iron, steel or metal products does not mean that the goods when received, were free of visible rust or moisture; if the shipper so requests, a substitute bill of lading will be issued omitting

---

**1.** A judgment of dismissal was previously entered on claims against *Hosei Maru* and Yasuda which was not disturbed on appeal.

**2.** Pursuant to the mandate from the Sixth Circuit Court of Appeals, this Court has entered a judgment in favor of Nicholson on its counterclaim for outstanding storage costs owed by Acwoo.

**3.** See the affidavit of Y.J. Chung which was submitted with Acwoo's remand brief.

**4.** The remaining coils were sold subsequent to their arrival in Detroit at a profit to another entity who is not a party to the instant litigation.

the above definition or setting forth any notations as to rust or moisture which may appear on the mates' or talley clerk's receipts.

No substitute bill of lading was issued. Further, the mate's or talley clerk's receipts for these coils were not made a part of the record by any party. Rain fell when the coils were loaded at Pohang, and some coils became wet. Rain also fell when additional cargo was loaded at Kobe, Japan.[5]

The *Hosei Maru* is a general purpose ocean going cargo vessel. Besides cargo decks, the ship was equipped with permanent and retractable " 'tween decks." The cold rolled coils were stowed in the number 2 and 5 holds. Above the number 2 hold were permanent and retractable " 'tween decks" where other cargo was stowed. The vessel had a natural ventilation system. Two openings, which were located in the entry compartment, ventilate each hold. Ventilation is important, as poor air circulation will permit moisture in the cargo holds to condense and, thereby, increase the risk of rust damage to the steel. During the crossing, which totaled seven days, rough seas were encountered on two separate occasions.[6] During these periods of inclement weather, the ventilation openings were apparently closed.

The *Hosei Maru* called at three U.S. ports before reaching Detroit: Jacksonville, Florida; Charleston, South Carolina; and Philadelphia, Pennsylvania. Rain fell in Charleston and Jacksonville while the cargo was unloaded.[7] At Jacksonville, automobiles were unloaded from the " 'tween decks" in the number 2 hold. Water was then able to enter this hold.

The ship docked at Nicholson's pier in Detroit on September 4, 1979. The coils were examined on the ship and, at Acwoo's insistence, on the pier by a total of four experienced marine surveyors who represented the interests of Acwoo, Toko, Nicholson and the latter's insurance under-

writer. However, none of these four representatives arranged to have the coils opened or "decanned" to determine whether the steel had been rusted. Moreover, it does not appear that the surveyors bent any of the flanges to determine if water had collected at those points where the wasters came together. The varying opinions of the four representatives were uniformly based on a visual inspection of the condition of the wasters which covered the coils. The wasters exhibited clear signs of atmospheric rusting, i.e., the untreated steel had turned a uniform reddish brown color. Additionally, all of the surveyors indicated that at least some of the coils had been exposed to an additional source of fresh water, leaving lighter colored streaks on some wasters. However, opinions among them differed as to the cause and the severity of this exposure.

Three of the surveyors viewed the cargo before it was unloaded. Hugh Fowley, a marine surveyor with twenty-five years of experience with steel cargoes, evaluated the coils on behalf of Acwoo and testified at trial as to their condition. He viewed the coils before they were unloaded from the ship on September 4, 1979 and in Nicholson's transit shed six days later. His view of the cargo prior to its removal from the *Hosei Maru* indicated fresh water rust damage to the wasters. With regard to the coils that had been stowed in the number 2 hold, Fowley identified two causes of the problem: water entering from the hatch and water dripping from the " 'tween decks" immediately above the number 2 hold. Those coils that had been positioned two deep below the hatch showed a pattern of rusting which is consistent with fresh water contact. This was especially pronounced in those coils immediately aft of the forward coaming line. Fowley's report noted that, where visible, these coils revealed an accumulation of water. In this

---

5. Inasmuch as there is no documentation in the record, this Court is unable to make any determination whether water had penetrated the coils when they were initially loaded onto the *Hosei Maru.*

6. There is no indication that any of the coils suffered rust damage as a result of sea water.

7. There is no evidence in the record of adverse weather conditions when the *Hosei Maru* called at Philadelphia.

regard, Fowley, in noting that the compartment way between the number 2 and 3 hatches was spotted with puddles of water, opined that the hatch had been left open during the rain.

Those coils, which had been positioned in the rows at the far starboard and port sides of the vessel, showed the effects of fresh water that had dripped from the " 'tween decks" above. Fowley noted that the " 'tween decks" in the number 2 hold had grain holes which would permit water to drip below to the cargo. The ship also had retractable " 'tween decks" which had been folded up at the time that he examined the cargo. In his report and trial testimony, Fowley opined that, when the cargo was unloaded from these retractable decks in the rain, water collected naturally and then dripped to the permanent " 'tween deck" when the decks were subsequently retracted. The water then flowed through the grain holes on the far port and starboard sides of the " 'tween decks" and onto the coils below.

Fowley identified a condensation problem with the coils that had been stored in hold number 5. Those positioned in the aft end of the vessel showed signs of heavy ship sweating as the result of fresh water contacts with the outer diameter of the coils.

Robert Harris, a marine surveyor with considerable experience with Asian steel cargoes, reported on the coils on behalf of Nicholson. He inspected the holds of the *Hosei Maru* between September 4 and September 6, 1979. Harris' report notes that the conditions in the number 2 hold were similar to those described by Fowley. The cold rolled coils were described as "Very rusty to Very Very Rusty all over and beaded with condensate rust". He also located a moderate drip patch on those coils below the forward coaming line, as did Fowley. As the cargo was removed from the hold and lower tiers of coils became visible, Harris reported that they had "Very Heavy condensate rusting". In the number 5 hold, Harris' report reflected uniform atmospheric and beaded rust due to condensation.

At trial, Harris amplified upon those rather terse observations which were recorded in his written report. Most notably and unlike Fowley, he attributed the fresh water rusting to condensation, as opposed to rain water. While he discovered that rain had been encountered when cargo was unloaded at a port called earlier by the ship, he did not know whether the cold rolled coils had been exposed to rain water. Harris noted that coils in shipping from Asian ports would routinely develop a uniform coating of atmospheric rust and progressive degrees of condensate rust. He opined that the heavier rust patterns on the coils below the forward coaming line in the number 2 hold were due to a collection of condensation on the coaming and a subsequent spilling onto the coils immediately below. It was his belief that this problem could be serious if it occurred over a prolonged period of time because the water could penetrate the steel. Photographs, which were taken by Harris of these coils, revealed the yellowish orange rusting pattern that had been described by Fowley with regard to the same coils. Additionally, Harris' photographs of the starboard and port sides of the vessel showed a pattern of rusting which is consistent with Fowley's conclusion that water ran down into the cargo holds from the " 'tween decks" as the cargo was unloaded in the rain. However, he opined that these streaks were due to condensation formed within the ship itself. Overall, Harris' opinion from his outturn survey was that the condition of the cargo was unremarkable and typical of other Asian steel cargoes.

Christopher Coury, an experienced marine surveyor, reported on the condition of the cargo before it was unloaded for Toko. In his opinion, the coils in both holds showed a coating of atmospheric rust and patterns of bubbles and streaks which were typical of rust caused by condensation. It was his belief that the quantity of rust was typical of Asian steel cargoes and, for that reason, unexceptional. Unlike Fowley, Coury did not notice any water in the compartments between the various holds on the *Hosei Maru*. However, he did concede

that the streaking condition on some of the coils could have been due to rain water. Coury also noted, as did the other surveyors, that some of the coils had been slightly bent out of round during the voyage. In his cover letter to Toko which enclosed his outturn report, Coury recognized the possibility of a claim based on damage to these coils. However, no mention was made of any possible claim based on rust damage to the coils.

The coils were then unloaded onto Nicholson's pier. According to the record, no rain fell during this operation. Following his examination of the cargo onboard the *Hosei Maru*, Fowley informed Toko's insurer about a possible claim for damage based primarily on the condition of the steel plate which had also been shipped on board the *Hosei Maru*. A joint survey of the coils and other cargo was then arranged. The cargo was examined at the Nicholson facility by Fowley and Russell Frank, a marine surveyor representing the interest of Acwoo's underwriter, after it was removed from the pier on September 10th. The main focus of the survey was the steel plate which had been damaged in shipping. Unlike the plate, Fowley did not conduct an inventory of the coil by bill of lading, noting that neither the total number of damaged coils nor any of the coils were specifically marked for future identification. At trial, Fowley estimated that water had penetrated about 50 of the cold rolled coils. However, his contemporaneous report contained notations on a smaller number of specific coils that had been observed by him on that date. All of the specific coils that he examined evinced water contacts in the inner diameter at the lowermost portions of the coil. With regard to one such coil, which had been affected by fresh water runoffs from the "'tween decks," Fowley noted that the inner paper lining had become wet. As to several other coils which showed heavy blistering, wet paper was also noted. Additionally, some sixteen coils were listed where Fowley had noted accumulations of water in the eye of the coil and at the lowermost portions of

the coils' outer diameters. Accumulations at these points can be critical because water can penetrate to the steel through those flanges that have been placed where the wasters come together. An examination of Fowley's handwritten notes which were recorded on Nicholson's dock sheets reveals that while numerous coils were noted with the problems that have been outlined above, only one was described as a "bad coil". At trial, Fowley explained that he was certain that this particular coil had been rust damaged.

None of the coils were decanned and examined immediately after the *Hosei Maru* discharged her cargo. An internal examination of the coils, which would have conclusively determined whether the steel had sustained rust damage, would have entailed a significant expense. In order to conduct such an examination, it would have been necessary for Acwoo to transport the coils to a steel mill and unwind them on appropriate equipment. Fowley recommended that Acwoo not take any further steps to demonstrate a loss to the cargo until some of the cold rolled coils had been sold. Nicholson's warehouse receipts note no exceptions for rust damage to the coils, although numerous exceptions were recorded for those coils that had been bent out of round or whose packaging had been disturbed.

The coils were stored in Nicholson's unheated transit shed for the next six months. Acwoo did not contract to have the coils stored in Nicholson's secure and heated facility or request Nicholson to take any particular precautions in storing the goods. It is apparent that the coils were exposed to significant moisture while in Nicholson's care due to the condition in the shed during the fall and winter and because of water leaks and flooding.

The only direct evidence of the arrangements made by Acwoo to warehouse the coils was provided by Roderick Scott, Nicholson's vice president for sales and development[8] who indicated that he had advised

---

**8.** Fowley testified that he understood that Acwoo had contracted to have the coils housed in Nicholson's transit shed under tarps with portable blowers to provide heat and ventilation.

Acwoo personnel to arrange to have the coils shipped by Toko to Nicholson's heated warehouse in Ecorse, Michigan. Having the coils shipped to Ecorse would have potentially been more expensive to Toko, but moving the coils from the Detroit pier to Ecorse would have been more costly to Acwoo. Scott was told that the coils would be placed in the shed on a temporary basis only—six weeks or less. The coils were placed on the shed floor without any additional protection.

Nicholson's transit shed is a large unheated structure which had formerly housed a brass foundry. Adjacent to the location of a former rail siding were a number of open doorways, which allowed moisture to enter the shed during periods of inclement weather. After the coils were unloaded, they were housed in four separate groups by gauge—not by bill of lading. The coils were moved within the shed after some of the pipes burst. Whether from the pipes or other roof leaks, a portion of the coils were drenched by water.

Benjamin Mack, a dock supervisor at Nicholson, testified that certain drain spouts in the rear portion of the transit shed burst during the winter. The pipes ran from ceiling to floor throughout the central part of the facility. He indicated that the pipe problem led water to accumulate on the floor.[9] Mack also expressed the belief that the water accumulated in the eye of the coils after the frozen condensation had thawed with warmer temperatures.

In March 1980, Fowley examined the coils when Acwoo arranged to sell some of them to a steel fabricator. His inspection revealed that water had dripped down from the roof onto the coils. The floor around two of the four groups of coil was visibly wet. He noted that warehouse personnel had used sand and chemical absorbants to form makeshift dikes to further protect them. Fowley stated that he noticed tidemarks on the lowermost portions of those coils and on adjacent dunnage, which indi-

cated that these goods had been sitting in water at some point. The floor around a third group of coils was revealed to be wet only when the group was moved. These coils also showed a rust pattern which indicated that water had dripped onto them. The remaining group of coils simply showed the effects of condensate rust. Fowley had the flanges of several coils bent to determine if water had collected in those areas where the metal wasters had come together. His inspection revealed that moisture had penetrated at points, as both moisture and tidemarks were present.

In early May 1980, a joint survey of the coils was held at Acwoo's prompting and a number of representative coils were selected to be decanned and inspected for damage. During the May joint survey, Fowley prepared an exhaustive inventory of 242 of the coils for the first time. Forty-three of the .047 gauge coils were described as "wetted/possibly rusted." Another fifty-two of this gauge were described as having a "strong possibility that they would be sound." Twenty of the .059 coils were thought to have "possible water/rust damage" but to be "worth a gamble to ship" to the buyer who had purchased some of the coils in March. Ninety-three of the .059 coils were set aside as "wetted/possibly rust marked" and held for decanning. Ten of the .029 coils were marked as having "some wetting", but with a quick sale little or no loss was expected. The condition of the remaining twenty coils was also described, but no overall opinion was expressed as to their condition. In particular, Fowley opined that the .035 gauge coils only revealed further condensate rust from their storage at Nicholson. When representative coils were decanned and unwound, a .035 coil was used as a control.

On May 27, 1980, the representative coils were transported to a steel mill, decanned and unwound. The steel was inspected by five marine surveyors: Fowley, Frank, Harris, Fred Smitka, on behalf of Toko, and Kurt Grandpierre, representing Nichol-

---

However, there was no direct evidence of such arrangement.

9. While Mack denied that there was a problem with water dripping onto the coils, this Court finds that the coils did suffer from such damage.

son's underwriters. Twelve of the coils were actually unwound and the remaining nine were only decanned.

In his written report, Grandpierre noted varying degrees of rust to the coils that had been unwound. In all cases, rust marks disappeared after two inches of the diameter of coil had been run. On the following day, Grandpierre went to Nicholson's transit shed and noted that all of the coils that he saw were equally coated with rust regardless of location within the shed. He opined that (a) in light of the earlier experience, 13 coils whose wasters and packing had been disturbed by handling were rust damaged, and (b) approximately 50 of the coils had been affected by an overhead wetting during storage and if the water had penetrated through to the packaging, the coils would have resulted in rust damage. Grandpierre's penultimate conclusion was that the rusting, which was observed when the coils were decanned, was due to condensation on ship and during storage at Nicholson's facility. His report did not distinguish between rust damage occasioned in transit and that which developed in the warehouse. Grandpierre had not viewed the cargo in September when it was unloaded from the *Hosei Maru.*

Only one of the surveyors, Fowley, claimed to be able to distinguish between the rust created on board the *Hosei Maru* and that which developed in the transit shed. Fowley estimated that 12 of the 21 coils had been damaged by the effects of pipe leaks and overhead wetting at Nicholson. Three coils were damaged by condensation at Nicholson. Two were viewed to be damaged in the *Hosei Maru*, and two from a combination of conditions at Nicholson and on the vessel. Two coils were viewed as possibly sound.

Fowley testified that rust damages from condensation could be distinguished from those wetted from overhead sources. With regard to the latter, water would penetrate the coils and, if it was of a significant volume, remain trapped in the paper coating. Condensation would collect at those vulnerable points where the wasters met and then enter between the numerous lay-ers of steel. Fowley also contended that he was able to distinguish rust that developed on the *Hosei Maru* from the later Nicholson rust by comparisons with his earlier observations and by color. None of the other surveyors testified that such distinctions could be made.

In particular, Harris, who had also viewed the coils when they were unloaded from the shed, stated that he was unable to determine the source of the rusting. Harris had toured the Nicholson shed in March 1980 following a period of severe weather. He noted that rain water had leaked through the roof and that a conduit had burst which leaked water onto the floor where the coils had been placed. The floor in this area was flooded with water between a quarter and a half-inch deep. Harris estimated that about 80 coils had been affected by these leaks. Harris testified that during his tour of the Nicholson transit shed in March with Fowley the flanges on a number of coils were bent and water was detected. This, he believed, was a sign that rust would be found in the steel. Water was found regardless of where the coil was stored in the warehouse. When the representative coils were decanned and unwound, Harris noted a consensus among the surveyors that there had been rust damage to each unit.

Following the survey, Fowley solicited bids on behalf of Acwoo, and the coils were sold at a loss as salvage. A loss of $136,-733.54 was sustained on the coils, which was undisputed. Additionally, evidence was presented which established that Acwoo spent $8,434.56 to have the coils transported and unwound for examination.

## II.

### A. Acwoo's claim against Toko

Acwoo's claim against Toko arises under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1303, which provides in relevant part that

(1) The carrier shall be bound before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy;

**1460**

(b) Properly man, equip and supply the ship;

(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation.

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

Plaintiff can establish a *prima facie* case of liability under the Act by showing "(1) delivery of the goods to the carrier in good order and condition, and (2) discharge from the vessel in damaged condition. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981)." *Acwoo, supra*, 840 F.2d at 1287. Acwoo has failed to demonstrate by a preponderance of the evidence that the cargo was discharged by Toko in a damaged condition. The Court also holds that Acwoo has failed, as a matter of law, to establish that the goods were delivered to Toko in good order and condition.

■ Acwoo's argument on remand to establish delivery in good order is convoluted and must be rejected. Acwoo apparently concedes that the bills of lading, qualified as they are by the Retla rust clause, cannot establish delivery in good order and condition standing alone. *See Acwoo, supra*, 840 F.2d at 1287–1288 ("[a] bill of lading with a rust clause ... is not clean and cannot be used to establish delivery of the steel to a carrier free of rust"). Rather, it appears that Acwoo has based its argument, in part, upon evidence that (a) the charter agreement required the bills of lading to conform to the mate's receipts, and (b) the mate's receipts were not entered into the record to the conclusion that the bills of lading are clean despite the rust clause. Acwoo contends that Toko's failure to introduce the mate's receipts into evidence must be taken as an indication that they noted no preshipment rust condition. However, such a negative inference is too tenuous a reed to support a *prima*

*facie* case. As a general rule, the absence of potentially material evidence raises a presumption that it is unfavorable to the party who has possession and control of it. *See, e.g., Tupman Thurlow Co., Inc. v. The S.S. Cap Castillo*, 490 F.2d 302 (2d Cir. 1974), *Nissho–Iwai American Corp. v. S.S. Eurymedon*, 1981 A.M.C. 2063, 2066 n. 1 (S.D.N.Y.1981) (shipper's failure to provide ship's log of portion of voyage where there would be the greatest need to ventilate vessel). Here, despite the provisions of the charter agreement, Acwoo agreed to bills of lading which contained a rust clause, and there is no evidence that any request was made for a substitute. Given this, the failure of Toko to introduce the mate's receipts into evidence cannot, standing alone as it does, support an inference of delivery in good order and condition. *Cf., The S.S. Cap Castillo, supra.*

On the basis of the outturn reports and the weather conditions during the passage and at the various ports called by the *Hosei Maru*, it appears that the coils which were stored in the number 2 hold suffered overhead wetting caused by a combination of condensation and rain water run off from the " 'tween decks." Some coils in the number 5 hold also showed marks of overhead condensate rusting. While there was record evidence that moisture had penetrated to the paper lining of some of the coils, there was no evidence from which this Court can conclude that the coils suffered rust damage during their transit on Toko's vessel.[10] In this regard, Acwoo's failure to open any of the coils for evaluation is fatal to its contentions at trial.[11]

Since there is no reliable evidence as to the preshipment condition of the coils and because the absence of the mate's receipts is insufficient to establish delivery in good preshipment condition, this Court holds that Acwoo has failed to establish a *prima facie* case.

**10.** Because of this failure of proof and the lack of corroboration, the Court cannot credit Fowley's testimony that the source of the rust observed when representative coils were opened could be determined.

**11.** In light of the weather at Pohang, it is possible that some of the coils were wet before they were loaded on the *Hosei Maru*.

■ Acwoo may establish liability if it can demonstrate that Toko's negligence was the proximate cause of the damage sustained. Acwoo's contentions in this regard are that (1) the *Hosei Maru* had an inadequate ventilation system, and (2) the shipper was also negligent in unloading cargo during the rain before the ship called on Detroit. This claim must fail because Acwoo has failed to meet its burden of proof to show that the coils were damaged in Toko's possession. More specifically, Acwoo has failed to demonstrate by a preponderance of the evidence that acts of the charterer negligently caused the rust damage which undeniably occurred.

For these reasons, an order of dismissal must be entered in favor of Toko and against Acwoo.

### B. *Acwoo's Claim Against Nicholson*

Acwoo's claim against Nicholson is founded in Michigan law. This Court has jurisdiction over this claim based on the diversity citizenship of the parties. 28 U.S.C. § 1331.

Under Michigan law, the bailor must demonstrate that (1) the warehouseman failed to exercise reasonable care, and (2) his negligence proximately caused the injury suffered. M.C.L.A. § 440.7102(1)(h). Similar to COGSA, Michigan law "provides that a bailor can make out a *prima facie* case of liability against a warehouseman by showing two things: (1) delivery of the goods in good order; and (2) return of the goods in a damaged state. *Columbus Jack Corp. v. Swedish Crucible Steel Corp.*, 393 Mich. 478, 227 N.W.2d 506 (1975)." *Acwoo*, 840 F.2d at 1290.

■ While Acwoo, the bailor, has amply demonstrated that its steel was returned from Nicholson, the warehouseman, in a damaged state, it has not shown that the goods were delivered in good order. Acwoo argues that Nicholson's warehouse receipts, which note no exceptions for any rust damage, establish delivery in good order. Even if this Court had concluded that a "clean" warehouse receipt could establish its receipt of the goods in good order, the record clearly rebuts such a presumption.

In the analogous case of bills of lading issued by a shipper, courts have recognized that a clean bill of lading as to cargo whose condition cannot be determined from outward observation does not conclusively establish delivery in good order. *See The Niel Maersk*, 91 F.2d 932 (2d Cir.1937) (L. Hand, J.), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937), *Philipp Bros. v. MV Sabogal*, 490 F.Supp. 975 (S.D. N.Y.1980). That principle is properly applied to the present case. Here, despite the existence of warehouse receipts, there is evidence that the coils were exposed to (a) the rain water before shipping and *en route,* and (b) the effect of condensation on the *Hosei Maru.*

This Court also concludes that the coils were exposed to condensation and other fresh water contacts in Nicholson's transit shed. An examination of the coils at Nicholson in March 1980 revealed that water had penetrated to the steel through those crucial areas where the wasters came together. It is apparent that the coils had been exposed to additional fresh water from the floor, where it collected when the conduit burst, and from above. However, the cause of the rusting cannot be determined.

Harris opined that the coils had been internally wet when they were placed in the shed from the ship and that wetting from conditions at Nicholson was not conclusively established. It was his belief that rusting was not unexpected given this history and that the problem could have been avoided if the coils had not been stored for such an extended period of time in the transit shed. Similarly, Grandpierre associated the rusting to condensation at Nicholson and on the *Hosei Maru.* On this narrow issue and on the basis of the entire record, this Court cannot accept the views of Fowley who concluded that the source of the rust on the steel, as opposed to that on the wasters, could be precisely determined. None of the other experienced surveyors corroborated this testimony. Moreover, none of the notes from Fowley's outturn survey in September 1979 were sufficiently precise enough to make the requisite com-

parisons. It is apparent in comparing the results of the September 1979 outturn surveys with the 1980 observations that the coils were exposed to more severe conditions at Nicholson's transit shed. Given that the coils were exposed to the inclement weather in Korea and the condensation and rain while en route to Detroit, and the lack of any record as to preshipment condition as well as the absence of any evidence as to the condition of the steel at outturn, it is impossible to determine the cause of the rust damage noted in May 1980. For this reason, Acwoo has failed to make out a *prima facie* case against Nicholson. *See Acwoo*, 840 F.2d at 1290.

Since Acwoo has failed to demonstrate that the conditions at Nicholson were a proximate cause of the rust damage, it has not made out a case against Nicholson under the traditional negligence doctrine. Where the plaintiff cannot demonstrate in whose hand the damage occurred, its claim must of necessity fall. *See Acwoo, supra; also see Associated Metals and Minerals Corp. v. The M/V Rupert De Larrinaga,* 581 F.2d 100 (5th Cir.1978) (per curiam) (under COGSA). Thus, an order of dismissal in favor of Nicholson and against Acwoo must be entered.

### Conclusion

For the foregoing reasons, an order of dismissal with prejudice shall be entered in favor of the Defendants and against Acwoo in the above-captioned cause.

IT IS SO ORDERED.