**M. GOLODETZ EXPORT CORP., and Algemene Verzekeringsmij Mercator, Plaintiffs-Appellants-Cross-Appellees,**

**v.**

**S/S LAKE ANJA, her Engines, tackle, boilers, etc., Eurolakes Tanker Line A/S, Blystad Shipping Inc., Arne Blystad A/S Oslo, Blystad Shipping Inc., Oslo, A/S Songa, Defendants-Appellees-Cross-Appellants.**

**No. 434, Dockets 84–7390, 84–7392.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1984.

Decided Jan. 2, 1985.

David L. Mazaroli, Yorkston W. Grist, P.C., New York City, for plaintiffs-appellants-cross-appellees.

M.E. DeOrchis, DeOrchis & Partners, New York City (Manuel R. Llorca, Diane M. Rollo, New York City, of counsel), for defendants-appellees-cross-appellants.

Before KAUFMAN, OAKES, and NEW-MAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

M. Golodetz Export Corp., a seller and shipper of fats and oils, brought this action in the district court against the S/S Lake Anja *in rem* and her owners and charterers *in personam,* pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et seq.* (1982). Golodetz claimed its cargo was loaded aboard ship in good condition and offloaded in a damaged state. The ocean carrier responded that any damage was the direct result of a collision at sea for which the crew of the S/S Lake Anja was not responsible, and thus fell within the "q clause" exception to COGSA liability. *See id.* § 1304(2)(q).

The district judge, in an unreported decision, found that the carrier intentionally disregarded heating instructions delivered by the shipper and that the resulting overheating was a concurrent cause of the damage to the cargo. He found that the delay occasioned by the collision was also a concurrent cause of the damage, and that such cause fell within COGSA's "q clause." Because the delay approximately doubled the length of the voyage, the court below found the carrier liable for one-half of the total damages.

In quantifying damages, Judge Brieant held that Golodetz had failed to mitigate its losses, and therefore awarded it one half of the damages it would have sustained had it resold the cargo as soon as it learned of the rejection by a non-party consignee—a total of $183,128.

On appeal, Golodetz argues that the trial judge erroneously apportioned loss between excepted and unexcepted COGSA causes on the basis of fault and, in any event, that the collision delay was not a concurrent cause of the damage. It also urges that it should not be held to have failed to mitigate its damages. The ocean carrier cross-appeals, asserting that it was never bound by the heating instructions.

We affirm the district court's rulings that the carrier was bound by the heating instructions, and that Golodetz failed to mitigate its losses. We reverse, however, the apportionment of damages between shipper and carrier, because such a division of losses is not supported by the relevant case law.

As always, our discussion of the pertinent legal points is meaningful only by reference to the facts of the case before us. Because this appeal arises from a rather byzantine factual setting, we find it necessary to set it forth in some detail.

## I. BACKGROUND

### A. *Tallow*

Tallow is animal fat used in the manufacture of soap and candles, and is an ingredient in cattle feed. Generally, it is produced in meat-packing or rendering plants. The types and grades of tallow vary, and the characteristics of a given shipment greatly affect its value. Edible tallow, for example, is fat rendered from the edible parts of an animal, and is considerably more costly than the inedible commodity. Inedible tallow—the type shipped aboard the S/S Lake Anja—is also graded and priced according to certain uniform specifications.

Of particular interest in this case are two such specifications used in the grading of tallow—"FFA" and "R + B color." Tallow is a compound of fatty acids and glycerine. FFA (Free Fatty Acid) provides a measure of how much of the fatty acids has broken free of the triglyceride molecule. In essence, FFA—described as a percentage—refers to the purity of the tallow. The higher the FFA, the less homogenous (and less valuable) the commodity.

R + B color (Refined and Bleached color) measures the bleachability of the tallow. To derive that figure, a sample is refined and bleached in a laboratory, and is then compared visually to a standardized color chart. The amount of red pigmentation in the sample (i.e. the tallow's darkness) is expressed as a number, which increases as

the color saturation becomes greater. Accordingly, a batch of tallow with an R & B color of 1.5 Red, for example, is more valuable than a batch measuring 2.5 Red.

Finally, it is worth noting that tallow has a relatively low melting point—somewhere between 125° and 130° Fahrenheit. When shipped, it is maintained in a liquid or semi-liquid state. When transferred—from railway tank cars to shore tanks, for example, or from shore tanks to a ship—it is heated to a liquid and pumped through pipes. This constant heating, cooling and reheating is critical to the proper loading, storage and discharge of a cargo of tallow. But, as shall be seen, a few too many degrees may, over the course of time, transform 4,500 tons of Bleachable Fancy Tallow into nine million pounds of animal fat.

## B. *Onloading*

On January 14, 1980, the S/S Lake Anja took on 1,018 tons of Inedible Bleachable Fancy Tallow at Reserve, Louisiana, a port on the Mississippi River near New Orleans. The shipment had been purchased "FOB vessel" by the M. Golodetz Export Corp. (which will be referred to as "Golodetz" or simply the "shipper"), a New York firm that trades and exports animal fats and vegetable oils. In turn, Golodetz consigned

the shipment to its customer, Ch. Daudruy Van Cauwenbershe et Fils ("Daudruy") of Dunkirk, France, in fulfillment of an agreement previously entered into between the two parties. The Golodetz-Daudruy contract provided that the tallow was to be delivered at Dunkirk. Daudruy was to pay $605.00 per metric ton, with 90% of the purchase price payable upon presentation of the bill of lading and the balance due "after determination of delivered weight and quality." It is to be noted that the Uniform Export Contract entered into by the parties set forth precise quality standards for the tallow. Specifically, it provided that Daudruy could reject the shipment if the FFA exceeded 5.00%[1] or the R & B color was above 1.5.

Golodetz commissioned an independent laboratory to draw and scientifically analyze a sample of the tallow that had been pumped aboard the S/S Lake Anja at Reserve. The FFA was reported to be 4.00% and the R & B color 0.7 Red.

While the S/S Lake Anja was still at Reserve, Golodetz forwarded a one-page letter containing detailed heating instructions to the vessel. That document (reprinted in the margin)[2] provided that the

---

**1.** The contract provided for a maximum FFA of 4.00%, with a cost allowance for any increase above 4.00% but below 5.00%. Only if the FFA reached or exceeded 5.00% however, would the shipment be deemed rejectable.

**2.** The full text of the document is as follows:
GENTLEMEN:
Please find below heating instructions to be followed during the carriage and discharge of the above captioned parcel. These instructions shall apply to each individual ship's tank.
1.) Ship's coils must be completely covered by the cargo on completion of loading.
2.) Heating shall be effected by means of hot water or, if this is impracticable, by means of low pressure steam.
3.) During the voyage the cargo must be kept at a temperature of minimum 108F (42.2c) to maximum 118F (47.8c).
4.) In sufficient time prior to arrival at port of discharge, heat should be applied steadily to ensure that the temperature of the cargo at time of discharge should not be less than 129F (53.9) and not more than 136F (57.8). The cargo

should be maintained within this range of temperature throughout the discharge.
5.) The increase in temperature of the cargo during a period of 24 hours *must never exceed 5F.*
6.) In order to avoid any damage to the quality of the cargo, it is essential that heat should be applied gradually. A sudden increase in the temperature must be avoided as it will almost certainly result in damage to the cargo.
7.) At no stage of the handling must the temperature of the cargo exceed 136F (57.8c).
8.) Top and bottom temperatures should be maintained as equal as possible.
9.) The temperatures referred to above are the average of top, middle, and bottom readings. The top reading will be taken at about one foot below the surface of the cargo. The bottom reading will be taken:
   A.) In tanks which have coils on the floor, at one foot above the level of the coils.
   B.) In tanks which have side coils but no floor coils, at a point about two feet from the bottom of the tank and about one foot from each of the side coils.

cargo should not be heated above 118° Fahrenheit during the voyage, but could be raised to a temperature not to exceed 136° Fahrenheit in preparation for discharge. It also stated that the increase in temperature should never exceed 5° Fahrenheit in any twenty-four hour period and daily temperature readings should be taken and recorded. At the bottom of the instruction sheet, below the legend "please acknowledge receipt by signature below," the first mate signed his name "for [the] master of the vessel."

On January 19, the procedure described above was repeated at Avondale, Louisiana, a nearby port on the Mississippi River. 1,019.089 tons of tallow were loaded aboard the S/S Lake Anja. The cargo had been purchased "FOB vessel" by Golodetz and consigned to Daudruy pursuant to the same Uniform Export Contract. Samples were drawn and tested. The FFA was put at 3.47% and the R & B color at 1.0 Red. Heating instructions identical to those used at Reserve were transmitted to and acknowledged by the master of the ship.

Two days later, a third and final delivery of tallow comprising 2,490.982 tons, was loaded aboard the ship. This amount was already owned by Golodetz and stored in its warehouse at Harvey, Louisiana. It, too, was consigned to Daudruy and, again, the bill of lading was delivered to and signed by the ship's master together with a copy of the heating instructions already described. The tallow pumped aboard ship at Harvey showed an FFA of 3.13% and an R & B color of 0.8 Red.

By the end of the day on January 21, 1980, the S/S Lake Anja had in its tanks a total of 4,528.979 metric tons of Inedible Bleachable Fancy Tallow owned by Golodetz and consigned to a purchaser in France, where the ship was destined.[3]

### C. The Voyage

The S/S Lake Anja set sail on January 24, 1980, and was due to arrive in Dunkirk, France on February 8. The first thirteen days of what was to have been a fifteen-day crossing passed uneventfully. On the 7th day of February, however, as the ship was entering the English Channel, it collided with another vessel, the "Maryious City." The accident ripped a hole in the Lake Anja's hull on the port side some seven feet below the water line, but none of the Golodetz cargo was lost or damaged as an immediate result of the accident. The collision did, however, cause the vessel to detour to Rotterdam, where she discharged her Rotterdam cargo and put in for repairs for a period of nineteen days. On February 26, having been restored to seaworthy condition, the Lake Anja made its way from Rotterdam to Dunkirk, a trip that lasted some eight to ten hours.

### D. Discharge and Rejection

Sometime late in the day on February 26, 1980, the Golodetz cargo was pumped into barges and transferred to Daudruy's shore tanks in the port of Dunkirk. As provided in the Golodetz-Daudruy contract, 90% of the purchase price was paid upon presentation of the bills of lading.

The consignee, Daudruy, had samples taken of the off-loaded tallow, which were analyzed at a commercial laboratory in Paris. One sample showed an FFA of 5.80%. R & B color ranged from 1.6 to 3.5 Red—well beyond the permissible range set forth in the contract. Accordingly on February 27th, Daudruy rejected the cargo by sending Golodetz the following cable:

10.) The temperatures indicated in (4) and (7) above are applicable under normal conditions prevailing at port of discharge. In the event of abnormal conditions (such as extremely low atmospheric or water temperatures) receivers of the cargo (but no one else) may vary the temperatures stated, by giving wireless or written notification to the captain or shipowner. Details of any amendments must be duly recorded and advised to shippers or their representatives. Please acknowledge receipt by signature below. Daily temperature readings of the cargo should be recorded on the attached chart which is to be signed by either the captain or the chief officer of the vessel and to be turned over to the receivers of the cargo upon arrival.

3. The Golodetz cargo at issue in this appeal filled three of the S/S Lake Anja's thirty tanks. The remaining twenty-seven were filled with other cargoes of tallow (some of them consigned by Golodetz), which were bound for Rotterdam.

The checkup by our laboratory of the above-captioned goods at present in the course of inspection shows a quality not in accord with the contractual characteristics. We are compelled forthwith to refuse this merchandise which we are having stored at your charge, risk and peril while awaiting the confirmation of our results by official laboratory on samples taken in presence of your surveyors.

Golodetz arranged for additional analyses of the tallow to be conducted by another approved laboratory. It confirmed that the cargo did not meet the specifications set forth in the contract.

At that point, Golodetz invoked the arbitration provision of its agreement with Daudruy, and sought to force the consignee to accept the cargo and remit the 10% of the purchase price as yet unpaid. Daudruy cross-claimed before the arbitration panel, seeking return of the 90% of the price already paid. In July of 1981, almost seventeen months later, the arbitrators filed their decision and award. They found that the cargo was, in fact, nonconforming and the rejection was therefore permissible. Daudruy was awarded a total of $2,241,029.07 (the amount it had already paid out) and ordered to return to Golodetz all documents of title to the tallow. Ultimately, the once Inedible Fancy Bleachable Tallow, now not so fancy, somewhat aged and sitting congealed in the Dunkirk tanks, was sold to Daudruy at a "salvage" price of $435.00 per ton, down from the $605.00 per ton price specified in the original contract. The resulting difference amounted to more than three-quarters of a million dollars.

### E. Proceedings in the District Court

Having sought and failed to compel acceptance of the cargo before a panel of arbitrators, Golodetz turned its attention to the ocean carrier in an attempt to shift the loss. On April 6, 1983, Golodetz and N.V. Algemene Verzekeringsmij Mercator ("Mercator"), the lead underwriter for the consortium that had insured the cargo, filed an action in the Southern District of New York against the S/S Lake Anja *in rem* and against its owners and charterers

*in personam.* The suit, brought pursuant to the Carriage of Goods by Sea Act, charged that the damage to the cargo resulted from an unexcepted COGSA cause. Plaintiffs below sought to recover the difference between the contract price and eventual sale price plus incidental damages.

The action was tried before Judge Brieant, sitting without a jury, on three consecutive days in March of 1984. At the conclusion of the trial, the judge set forth his findings of fact and conclusions of law from the bench.

Specifically, the able trial judge, in dealing with this difficult case, found that the shipper had met its burden of showing that the tallow was loaded aboard the S/S Lake Anja in a condition that conformed to the Golodetz-Daudruy contract, and that the cargo failed to meet those specifications when it was discharged at Dunkirk. Although the carrier was not a party to that agreement, and thus could not be bound by its terms, Judge Brieant concluded as a matter of law that the special heating instructions "were actually delivered to and acknowledged by the master of the vessel," and so "became a part of the contract of affreightment by which the defendant was bound." He found that the crew of the officers of the vessel "willfully and intentionally" ignored the instructions.

Turning to the collision and its aftermath, the court found that the accident was in no way attributable to the fault or negligence of the agents or servants of the carrier. Moreover, the judge found that the delay of 19 days occasioned by the collision was not unreasonable.

At this point, the findings seem to become somewhat confusing. The judge stated that the damage to the tallow was a function of "heat plus time." Overheating, as has been noted, was attributed to the carrier. Time, on the other hand, was not. Judge Brieant ruled that the intentional overheating of the cargo and the delay caused by the collision were concurrent causes of the damage. Because the detour to Rotterdam approximately doubled the

length of the voyage, he attributed one-half of the loss to each cause. Accordingly, he found that the carrier was liable for 50% of the damages.

Finally, the judge considered the question of quantifying the correct measure of damages. After setting forth the law that a shipper may not recover damages that could have been avoided by reasonable efforts, he ruled that Golodetz had failed to fulfill its obligation to mitigate its losses. He specifically found that the tallow, although not in conformity with the terms of the Golodetz-Daudruy contract, was merchantable as discharged at Dunkirk. Rather than letting it age in the consignee's tanks, he reasoned, Golodetz could have sold it at the then prevailing market price for tallow of its quality. Placing this fair market value at the time of rejection at $550 per ton, the court calculated damages as the difference between $605 and $550 (contract price minus fair market value), rather than $605 and $435 (contract price minus price actually realized). Disallowing various incidental costs that would have been avoided had Golodetz resold the goods immediately, and allowing Golodetz the costs it would have incurred in connection with resale, Judge Brieant awarded damages in the amount of $183,128.

## II. The Law

### A. *The Shipper's Initial Burden*

■ Pursuant to Sections 3 and 4 of COGSA, 46 U.S.C. §§ 1303, 1304 (1982), a shipper seeking to recover from a sea carrier for damage to cargo bears the initial burden of proving that the cargo was delivered to the carrier in good condition and outturned in a damaged state. *Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir.1983); *Vana Trading Co. v. S.S. Mette Skou*, 556 F.2d 100, 104 (2d Cir. 1977); *M.W. Zack Metal Co. v. S.S. Birmingham City*, 311 F.2d 334, 337 (2d Cir. 1961), *cert. denied*, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). A plaintiff shipper is not required to prove that the carrier was at fault, or how the damage might have occurred. *Nissho-Iwai v. M/T Stolt*

*Lion*, 617 F.2d 907, 912 (2d Cir.1980). The district judge specifically found that Golodetz had offered evidence sufficient to meet its preliminary burden, and we are not prepared to characterize his finding as "clearly erroneous." *See McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).

The judge also found that the master of the Lake Anja, acting through a mate, accepted the special heating instructions delivered to the ship by Golodetz's agent, and accordingly the instructions became part of the contract of affreightment. Whether or not we agree with this analysis, it is clear that an action will lie for the intentional disregard of those instructions. It is not altogether clear that the carrier, by "acknowledging receipt" of the instructions, agreed to bind itself by the explicit terms of those specifications. The carrier argues strenuously that the gangplank of a ship in the process of loading cargo is a busy place; shippers' agents scurry about delivering papers to the mates, and the mates routinely sign for "receipt" of the papers. The shipowner asserts that a rule of law that binds the recipient to the terms of each paper thus received would work a terrible hardship on carriers, and would require that attorneys be strategically placed at the top of gangplanks to review documents before they are "acknowledged."

We agree that such a rule might be unworkable, and that Golodetz could have chosen more binding language than "Please acknowledge receipt by signature below," if it meant to work a modification of the contract of affreightment. We need not, however, hold that the carrier was bound by the special heating instructions solely because it "acknowledged" the receipt of written instructions in each of three ports.

■ Uncontested testimony was introduced at trial establishing that instructions similar to those transmitted to the carrier have been employed in the shipping trade for many years. Tallow, after all, is a product that requires heating during ship-

ment, and the S/S Lake Anja is equipped for precisely that purpose. An experienced carrier knowing the nature of his cargo and aware of its special heating or cooling requirements, cannot be heard to complain that the bill of lading neglected to mention those requirements. *See Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 620 (2d Cir.1980). We have held that "a bill of lading will be presumed to have been issued subject to [custom]", *Encyclopaedia Brittanica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 17 (2d Cir.1969), and this rule has direct bearing on the instant appeal. Assuming the signed receipt of the heating instructions did not effect a binding modification of the contract of affreightment, we are nonetheless impelled to the conclusion that the ocean carrier was bound by those instructions in light of their longstanding use in the tallow trade.

■ We need spend little time reviewing the trial court's finding that the vessel's crew intentionally ignored the temperature limits, for the evidence clearly supports such a conclusion. The ship's Chief Officer, Mr. Kalve, as much as admitted that the maximum limits were ignored, as was the prescribed speed at which the tallow could be heated in preparation for its discharge. Moreover, Judge Brieant recognized that the carrier had a motive for ignoring the instructions, and in fact ignored similar heating specifications on a regular basis. The regularity with which such specifications were ignored, however, need not concern us today. It is enough to say that the carrier was bound to follow the specifications, and chose not to do so. Moreover, as a direct result of that choice, the cargo with which it was entrusted was outturned in a damaged condition.

B. *Liability of the Carrier*

■ The shipper having made its prima facie case, the burden shifts to the carrier to show that the cause of the damage fell within one of the COGSA exceptions set forth in 46 U.S.C. § 1304(2) (1982). *Vana Trading Co. v. S.S. Mette Skou, supra*, 556 F.2d at 105; *J. Gerber & Co. v. S.S.*

*Sabine Howaldt*, 437 F.2d 580, 588 (2d Cir.1971). The trial judge found that the collision in the English Channel fell within the catch-all exception to COGSA liability— the so-called "q clause," *see* 46 U.S.C. § 1304(2)(q) (1982), which provides that a carrier shall not be liable for any damages resulting from "any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier . . . ." Deeming the delay to be a natural incident of the collision, the judge went on to hold that the damage caused by nineteen extra days of overheating could not be charged against the vessel.

■ We disagree, for the cases suggest that, in this setting, the delay cannot be said to be a cause that relieves the carrier of liability for the cargo damage that occurred during the delay. Accordingly, we reverse the district court's ruling that the carrier bears no COGSA liability for such damage.

■ In *Schroeder Bros., Inc. v. The Saturnia*, 226 F.2d 147 (2d Cir.1955), an ocean carrier argued that a delay caused by a labor strike relieved it from liability for damage to cargo caused by improper ventilation during the delay. Although the strike constituted an excepted COGSA cause, *see* 46 U.S.C. § 1304(2)(j) (1982), this Court refused to absolve the carrier of liability. We held:

> The [carrier] has failed to establish that the . . . strike prevented it from providing sufficient ventilation. It has not been shown why, in spite of the delay, the cargo could not have been given the required ventilation or other steps taken to eliminate or minimize the loss.

*Id.* at 150. Our holding in that case made clear that the mere occurrence of an incident that would appear to fall within the list of exceptions to COGSA liability does not release the carrier from its responsibility to care for its cargo.

Accordingly, in the instant action, the carrier may not be absolved from liability resulting from overheating during the time

the Lake Anja was put up for repairs at Rotterdam, notwithstanding the trial judge's findings that the delay was not unduly lengthy and that the collision was not the fault of the carrier. The judge below alluded to the fact that improper heating over the course of the expected voyage might not have resulted in damage to the tallow. In light of *The Saturnia*, however, the appropriate question becomes whether proper heating over the course of the extended voyage would have caused the cargo to exceed its contractual specifications. Absent a finding in the affirmative, we must reverse the district court's determination that the carrier was absolved of liability for damage occurring during the delay. To do otherwise would be to release carriers from the responsibility to care for their cargoes in cases where such care is plainly possible and desirable.

## C. *Allocation of Loss*

We might, on the basis of the foregoing discussion alone, reverse the district court's division of damages, for we have made it clear that the carrier properly might be charged with the loss caused by overheating the tallow while the ship was at Rotterdam for repairs. In an effort to clarify a difficult area of the law, however, we turn next to examine whether the record provides a sufficient basis upon which to allocate such damages.

For half a century, the rule regarding apportionment of damages between shipper and carrier has been that the carrier must bear the entire loss unless he can show what portion of the damages is attributable to some cause for which he is not responsible. *Schnell v. The Vallescura*, 293 U.S. 296, 306, 55 S.Ct. 194, 197, 79 L.Ed. 373 (1934). Although the rule announced in *The Vallescura* predates COGSA's promulgation in 1936, it has been restated and followed in this Circuit to the present time. *See, e.g., Vana Trading, supra*, 556 F.2d at 104 & n. 7; *S.S. Sabine Howaldt, supra*, 437 F.2d at 588; *Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426, 431–32 (2d Cir. 1962).

The district court seems to have attempted to allocate loss by reference to degree of fault, for there was no evidence introduced regarding which tanks of tallow were damaged by time, and which by temperature. In fact, Judge Brieant found that all damages were a "function of time and temperature." Although such an attempt to connect liability to blame may, at first glance, appear to achieve substantial justice, this approach is supported neither by the cases nor the policy considerations that buttress the seemingly harsh rule of *The Vallescura*. In *Vana Trading, supra*, 556 F.2d at 106, we did suggest at one point that apportionment of loss was inappropriate because the district court "was unable to make a finding as to the allocable percentages of the degree of *fault*" (emphasis supplied). That comment, however, must be read as something less than authoritative, for we explicitly "decline[d]" the "invitation ... to apply to cargo suits the doctrine of proportional fault." *Id.* at 102.

A rule that requires an ascertainable apportionment of damages, as opposed to apportionment of fault, may occasionally lay at the feet of an innocent carrier a loss he could not prevent and for which he bears no blame "merely because the law, in pursuance of a wise policy, casts upon him the burden of showing facts relieving him of liability." *The Vallescura, supra*, 293 U.S. at 307, 55 S.Ct. at 197. That rule, however, simply reflects an understanding of the fact that the "circumstances upon which [a bailee] may rely to relieve him[self] of [his extraordinary] duty are peculiarly within his knowledge and usually unknown to the shipper." *See id.* at 304, 55 S.Ct. at 196; G. Gilmore & C. Black, *The Law of Admiralty* 162–63 (1957).

Accordingly, we hold that allocation of loss by reference to ascertainable apportionment of damages remains the rule in this Circuit. Even if the collision delay were deemed a concurrent cause of the damage to the Golodetz cargo, the total absence of evidence to support an appor-

tionment of damages requires us to reverse the district court's allocation formula. Simply put, the carrier must bear the entire loss.

### D. *Mitigation of Damages*

Finally, we turn to Judge Brieant's finding that Golodetz failed to mitigate damages, and thus could not recover the entire difference between the contract price of $605 per ton and the $435 it actually realized upon sale of the damaged tallow.

 The damage rule in admiralty cases generally does not differ from ordinary contract rules. *See Internatio, Inc. v. M.S. Taimyr,* 602 F.2d 49, 50 (2d Cir. 1979). As in any other action for contract damages, a shipper is under a duty to mitigate his losses. *See generally Santiago v. Sea-Land Service, Inc.,* 366 F.Supp. 1309, 1317 (D.C.P.R.1973). The venerable rule that requires a plaintiff to mitigate his damages has been explained by the principle that "damages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him." 2 *Williston on Contracts* § 1353 at 274 (1962).

Judge Brieant found that the tallow, although it did not conform to the terms of the Golodetz-Daudruy contract, was nonetheless merchantable as delivered to Dunkirk. Rather than attempting to arrange for its sale, however, Golodetz allowed the tallow to congeal in the consignee's tanks, and sit for nearly eighteen months while it sought to force acceptance through arbitration. Only after this effort had failed was the tallow, by then somewhat aged and considerably less valuable, sold at a "salvage price" to Daudruy, the original consignee, without third party bids ever having been sought. The district court found, and we agree, that the ocean carrier cannot properly be charged with the tallow's diminution in value between the moment Golodetz learned of Daudruy's re-

jection and the time of the eventual sale. We find that the measure of damages fixed by the district court correctly reflects the portion of the loss that may properly be charged against the carrier. We similarly affirm his rejection of Golodetz's claim for incidental expenses.

Accordingly, the judgment of the district court is affirmed in part and reversed in part, and the cause is remanded to the district court with directions to enter judgment in favor of Golodetz and Mercator for the full amount of damages as previously calculated.